UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH L. REED,

    Plaintiff,

    v.

FREEDOM MORTGAGE, a foreign corporation,

    Defendant.

No. 15 C 954
Judge James B. Zagel

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joseph Reed filed the instant lawsuit against his former employer, Defendant Freedom Mortgage Corporation ("FMC"), alleging that FMC discriminated against him in violation of the Illinois Human Rights Act ("IHRA"). Before the Court are the parties' Cross-motions for Summary Judgment. For the following reasons, Defendant's Motion for Summary Judgment is granted and Plaintiff's Motion for Summary Judgment is denied as moot.

**I. BACKGROUND**

Plaintiff Reed, who is African-American, was hired as a temporary FMC employee through a staffing agency. FMC is a full-service residential mortgage lender headquartered in New Laurel, New Jersey with local offices around the country. On November 1, 2012, on the recommendation of its Regional Operations Manager Cheryl Bidstrup, FMC hired Reed as a full-time Broker Liaison at the Downers Grove, Illinois location. Bidstrup, who is white, also recommended that Felicia Bates, an African-American woman, be hired as a full-time Broker Liaison.[1] Both Reed and Bates reported to Bidstrup, who herself reported to Vicky Sperry, the Regional Branch Manager.

---

[1] Bates is a former Plaintiff in this lawsuit whose claims were voluntarily dismissed with prejudice on February 26, 2016. (ECF No. 31)

In accepting full-time employment, Reed agreed to abide by FMC's policies, including the portions of its employee handbook stating that tardiness and absenteeism could result in disciplinary action or termination of employment. Specifically, FMC's Attendance Policy states that seven or more absences, late arrivals, or early departures in a 12-month period could trigger disciplinary action including termination of employment.

**A. Attendance Issues**

The Downers Grove office hours of operation were 8:00 a.m. to 5:00 p.m. However some employees worked different hours, such as 9:00 a.m. to 6:00 p.m., with the permission of senior management. Reed understood that he was expected to start work each day at 8:00 a.m., and although he assumed his colleagues were all subject to the same requirements, he testified that other Broker Liaisons may have had arrangements with Bidstrup and Sperry of which Reed was not aware.

On January 21, 2013, Bidstrup sent an email to her direct reports at Downers Grove. The email stated:

> [O]ur work hours are 8:00 a.m. to 5:00 p.m. at the Downers Grove physical location with an hour for lunch and 2-15 minutes breaks. Any deviation from these hours or location must be prior approved by Vickie and me. There will be no further 'setting your own hours' and assuming that you can stay until 6:00 p.m. to make up for coming in at 9:00 a.m.

On January 25, 2013, Bidstrup issued a verbal warning to Reed for violating the Attendance Policy. On January 29, 2013, Bidstrup issued a written warning for absenteeism and/or tardiness when Reed arrived at 9:30 a.m. without notifying his manager in advance. After these incidents, Reed was absent from work on at least eight days between February 14, 2013 and April 1, 2013. He testified that he does not recall whether he received prior approval for any of these absences. Additionally, Reed clocked in to work after 8:00 a.m. at least eleven times between March 6, 2013 and April 10, 2013, with arrival times ranging from a few minutes late to

2

over forty-five minutes late. Likewise, Reed's coworker Bates admitted to numerous infractions of the Attendance Policy, including submitting inaccurate timesheets which is a terminable offense under FMC's Employee Performance Policy.

Bidstrup informed Sperry that both Bates and Reed were repeatedly violating the attendance policy. After this conversation, on April 9, 2013, Bidstrup emailed the Downers Grove employees to reiterate that excessive absences or tardiness, even if defensible on an individual basis, may trigger disciplinary action including termination of employment. Bidstrup recalls that at some point, at least two employees complained to her that they had to cover some of Reed's responsibilities during his absences. Bidstrup does not remember any employees besides Reed and Bates having notable attendance issues.

A third Broker Liaison, Nicole Landis, who is white, also received a verbal warning for missing one day of work. Plaintiff alleges that Landis was actually out of the office for four or five days but Bidstrup and Sperry testified that, to their knowledge, Landis had no other attendance issues besides the single absence. Bates admitted that she did not know whether Landis had permission to miss work during any of her other absences, nor did she know whether Bidstrup was aware of Landis' alleged other absences. Bates emailed Bidstrup on March 7, 2013 complaining of "favoritism and unfairness" because Bates received an email about excessive absences while Landis did not. Bates did not mention race or racial discrimination in her email to Bidstrup, but complained of "a lot of unfair things in this office lately" and noted that "just a select few have a start time of 8:00am [sic]." Bates and Bidstrup also met to discuss these complaints.

Reed, too, testified that he observed Landis' many absences and tardies and believes they exceeded his own. However, he admits to having no evidence of either the absences and

3

tardies or of Bidstrup or Sperry's awareness of any attendance problems with Landis. Reed also alleges that two white team leads, Kathleen French and Sandy Bakir, regularly arrived late to work and that French, Bakir, and co-worker Bridgett Glass were allowed greater latitude than Reed to work from home.

As Reed's attendance problems continued even after the verbal and written warnings and the company-wide email, Bidstrup asked receptionist Susie Jurewicz, who is white, to monitor Reed's attendance since Jurewicz's desk afforded her a clear view of employees as they arrived and left the office. Reed alleges Jurewicz was also asked to monitor Bates and Cindy Hubbard, another African-American Broker Liaison.

In support of his claim that the attendance policy was discriminatorily applied, Reed offers video evidence of the workplace. According to Reed, the videos show that the 8:00 a.m. start time was only enforced for African-American employees. Neither Bates nor Reed was able to recall the date or time of the videos, which Bates purportedly recorded, and Reed admitted in his deposition that the videos do not capture the entire office and that absent employees may have had prior approval to miss work of which he was not aware. Because Plaintiff did not include the videos in his appendix of exhibits and because the videos have not been properly authenticated, I am not considering the contents of the videos in this review of the facts.

**B. Working From Home**

FMC required all Broker Liaisons to obtain prior approval before working from home. On January 21, 2013, Bidstrup emailed her direct reports reaffirming this policy and noting that working from home during regular business hours would be permitted at FMC's discretion and only in "an extreme emergency." Prior to the January 21, 2013 email, at least some of Reed's requests to work at home were granted. Reed admits that he was only denied the opportunity to

4

work at home after the January 21, 2013 email. Reed was told that one such request, on March 5, 2013, was denied because business was slow. He did not challenge or inquire further into that explanation. Another such request stated that because the schools were closed and his son had nowhere to go, it would be "a great pleasure if I could work from home," which Reed admits did not convey an emergency. Reed also testified that he was denied one request that he made while his son was missing and "[t]hey made me use all my sick days until we got the call back that they found him." Despite denying several of Reed's requests to work from home, FMC did allow Reed to take an extra 34 hours of paid sick time, more than he was allotted.

According to Reed, his colleagues Bakir, French, and Landis were "allowed to come and go as they pleased" and Bakir was regularly allowed to work at home for a family issue. Reed admits he does not know whether any of these employees received prior permission to work at home, nor does he know the specifics of their circumstances or work arrangements.

On March 29, 2013, Bidstrup emailed the Broker Liaisons that "based on current volume, a need to work from home is no longer supported for Broker Liaisons."

**C. Reed's Application to Become a Junior Underwriter**

Reed applied to become a Junior Underwriter, a position with some overlapping duties to Broker Liaison but a separate training process and job description. Reed was not offered the job, a decision Kelly Burgbacher, then a Regional Underwriting Manager for FMC, credits to his disciplinary record. Reed does not know whether the Junior Underwriters who were hired over him had disciplinary records, nor does he know what their qualifications were.

**D. The Reduction-in-Force and Closing of the Downers Grove Location**

In 2013, a nationwide decline in business prompted FMC to implement a reduction in force ("RIF") at its locations across the country. At Downers Grove, the Broker Liaison position

was gradually eliminated through multiple rounds of terminations. Michael Patterson, the Senior Vice President of FMC, ordered his reports (including Bidstrup and Sperry) to decrease expenses, and specifically asked them to reduce the workforce. The mortgage industry also experiences seasonal downturns in the winter months, and Reed contends that this explains any slowdown in 2013. FMC denies that the time period in question was characterized by an ordinary seasonal slump.

In mid-April 2013, Bidstrup and Sperry told Patterson they had selected Reed and Bates for the RIF because of their history of attendance and disciplinary problems and because they were more junior than their colleagues. Patterson and the Human Resources Department approved these recommendations and Reed was terminated on April 12, 2013. According to Bidstrup, a white employee, Patrick Flynn, was terminated at the same time as Reed and Bates. Following Reed's termination, the Broker Liaison position was wholly eliminated at the Downers Grove branch and eventually nationwide. No Broker Liaisons were hired to replace Bates or Reed. Ultimately, the Downers Grove branch closed on or around August 31, 2014, though a portion of the Underwriters and Junior Underwriters now work remotely for the Fishers, Indiana office.

Reed subsequently filed a charge with the Equal Employment Opportunity Commission ("EEOC"). He complained of being "subjected to different terms and conditions of employment, including but not limited to, having my job duties taken away and scrutiny. I was disciplined." This lawsuit was filed in October 2014 in the Circuit Court of Cook County and removed to this Court in January 2015.

## II. LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether any genuine fact issue exists, the court must assess the proof as presented in the record, including depositions, answers to interrogatories, admissions, and affidavits, to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Fed. R. Civ. P. 56(c); *Scott v. Harris,* 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011). If a claim or defense is factually unsupported, the court should dispose of it at the summary judgment stage. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. In response, the non-moving party cannot rest on bare pleadings but must designate specific material facts showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir.2000).

## III. DISCUSSION

On summary judgment an IHRA claim is generally analyzed under the same standard as a Title VII claim. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007). Title VII makes it unlawful for employers to discriminate against employees because of their race. 42 U.S.C. § 2000e, *et seq.* "In order to succeed in a Title VII lawsuit, a plaintiff must show that he is

a member of a class protected by the statute, that he has been the subject of some form of adverse employment action ... and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (citing *Coleman v. Donahoe,* 667 F.3d 835, 863 (7th Cir.2012) (Wood, J., concurring)).

In responding to a defendant's motion for summary judgment on a Title VII or IHRA claim, a plaintiff may proceed via the "direct" or "indirect" method as laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). No matter how the plaintiff proceeds, the Seventh Circuit has warned that although courts may get lost in the "technical nuances" of the two methods, the "central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)." *Morgan,* 724 F.3d at 996–97; *see also Van Antwerp v. City of Peoria,* 627 F.3d 295, 297 (7th Cir.2010).

Reed utilizes the indirect method. This method requires the plaintiff to show that "(1) she was a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably." *Han v. Whole Foods Market Group*, 44 F.Supp.3d 769, 792 (N.D. Ill. 2014); *McDonnell Douglas Corp.*, 411 U.S. 792. If the plaintiff establishes a *prima facie* case, a presumption of discrimination arises and the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse action. *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the employer does so, the burden shifts back to the plaintiff to present evidence that the stated reason is a "pretext." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Here, there is no dispute that Reed, an African-American man, was a member of a protected class or that his termination constitutes an adverse employment action. Although it

8

would appear that there is in fact a dispute about whether Reed met his employer's legitimate expectations, neither party devotes attention to that issue in their briefs. Thus, I reserve my analysis for the remaining issues—that is, whether Reed was treated less favorably than similarly situated non-African-American employees, whether the denial of his requests to work from home and his application for the Junior Underwriter position constitute adverse employment actions, and whether his racial harassment claim qualifies as a hostile work environment.

**A. Similarly Situated Employees**

Reed argues that his failure to meet expectations was no more egregious than that of the similarly situated white co-workers who were not disciplined or terminated as he was. Specifically, he names Nicole Landis, Kathleen French, and Sandy Bakir as white Broker Liaisons whose attendance issues he believes were treated more forgivingly than his own, Bates', and Hubbard's. A similarly situated employee must be "directly comparable" to the plaintiff "in all material respects." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). This means that, to make a meaningful comparison, the coworker must have "a comparable set of failings" and shortcomings to the plaintiff. *Id.* (finding that employees whose performance reviews contained fewer and different infractions than the plaintiff's were not similarly situated for purposes of a Title VII analysis) (citing *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003)).

Reed makes a host of allegations, many of which lack other evidence, in support of his argument that white Broker Liaisons were permitted to arrive at work later than their African-American counterparts and were given extra leeway with regard to the attendance policy. However, he produces no coworkers who are actually similarly situated to him. With regard to Landis, Reed admitted that he had no evidence of her absences nor did he have evidence that

9

Bidstrup and Sperry were aware of these absences. For her part, Bates admitted that she did not know whether or not Landis had obtained a supervisor's permission to miss work. On the one occasion that Landis did demonstrably miss work without permission, she received a verbal warning, just as Reed had. As for French and Bakir, the record is extremely sparse and consists primarily of Plaintiff's and Bates' testimony and an email from Bidstrup noting that "Nikki" and "Kathy" (purportedly Landis and French) were "out" and "late" respectively. There is virtually nothing in the record at all about Bakir. Plaintiff admitted that other alleged special treatment he observed, such as Bakir, French, and Bridgett Glass' ability to work from home on occasion, may have been approved ahead of time. Bakir, French, and Glass were also Team Leads with different job descriptions than Plaintiff and are thus not similarly situated.

In the alternative Reed argues that, even if the record doesn't establish disparate treatment of similarly situated coworkers, the disparate enforcement of attendance policies precludes summary judgment on this issue. He cites the Seventh Circuit's observation that, "When a black employee produces evidence that he was disciplined more severely than white employees who shared similar shortcomings, the second and fourth elements of the indirect method merge." *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). But that is precisely what Reed has not done here. There is no evidence that Reed was disciplined more severely than white employees with similar shortcomings, since, as established, Reed has not shown that any of his white employees did have similar shortcomings. Without such evidence, a reasonable jury could not find an inference of discrimination in this case. For that reason, I need not proceed to the question of whether FMC's proffered justification for terminating Reed's employment was a pretext.

**B. Adverse Employment Actions**

Reed argues that the company's refusal to give him special dispensation to work from home (although FMC points out that his requests were occasionally granted) constituted an adverse employment action separate from the termination. As I have already noted in a previous case, "[t]he fact that [Defendant] did not permit [Plaintiff] to work from home every time [he] requested is also not an adverse employment action. It is not an adverse employment action to refuse to grant an employee a discretionary benefit to which that employee is not necessarily entitled." *Haas v. Zurich North America*, 2006 WL 2849699, at *4 (N.D. Ill. Sept. 29, 2006) (Zagel, J.) Moreover, as discussed above, Reed provided scant evidence that the work-from-home policy disfavored African-Americans or was discriminatorily applied at all. Reed testified that Sandy Bakir was allowed to work from home "pretty much whenever she wanted to" and that French and Glass were similarly privileged but admitted he did not know whether any of them had prior approval to do so, nor did he have evidence showing when or how often they worked from home. Reed also admitted that he was allowed to work from home at times before the January 21, 2013 email went out reaffirming office hours and limiting employees' freedom to work from home. He could not name any date after January 21, 2013 on which he could show that Bakir, French, or Glass worked from home. On these facts, no reasonable jury could conclude that Plaintiff has met his burden on the work-from-home claim.

Plaintiff also includes a claim that is exceedingly similar to the failure to promote claim he previously dismissed with prejudice. (ECF 31). Here he argues that he suffered discrimination when Burgbacher did not "transfer" him to the Junior Underwriter Position as he had requested. Yet Reed provides no evidence that he was equally or more qualified for the position than a similarly situated non-African-American Broker Liaison. Nor can he refute that he had a verbal

11

and written warning for attendance issues when he applied for the Junior Underwriter position. Once again, this meager record does not provide sufficient evidence for a reasonable jury to decide in Plaintiff's favor.

**C. Racial Harassment Claim**

Finally, Reed alleges that he faced a hostile environment at work because FMC "threatened" to discipline him for his attendance issues. To survive summary judgment on a claim of racially hostile work environment, Reed must "present evidence sufficient for a reasonable jury to find that (1) the environment was both subjectively and objectively offensive; (2) the harassment he suffered was based on his membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Poullard v. McDonald*, 2016 WL 3924375, at *9 (7th Cir. 2016). Here, Reed does not allege conduct that could be termed harassment. The so-called "threat" here consists of emails sent out to clarify company policy to the entire team and individualized disciplinary actions after Reed's attendance infractions, including the written and verbal warnings and Bidstrup's request that Jurewicz help her monitor Reed's attendance. While Reed may have been subjectively distressed by these actions, a reasonable jury could not find either objectively offensive behavior or severe and pervasive conduct in the handful of instances of which Reed complains. Critically, the record also reveals no instance in which Reed ever complained to Defendants of racial harassment or discrimination and no evidence that the attendance policy was not applied uniformly. Thus, Plaintiff has not met his burden.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted and Plaintiff's Motion for Summary Judgment is denied as moot.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: October 5, 2016